IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:05CR406 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | |
| GILBERT A. HERNANDEZ and | ) | |
| LUISANA MIRANDA, | ) | RECOMMENDATION |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the motions to suppress filed by defendants Gilbert A. Hernandez (Hernandez) (Filing No. 27) and Luisana Miranda (Miranda) (Filing No. 35). The defendants are charged in the Indictment with the possession with intent to distribute 5 kilograms or more of cocaine (Count I) in violation of 21 U.S.C. § 841(a)(1). They are also charged in Count II with a criminal forfeiture of $9,415 in U.S. Currency in violation of 21 U.S.C. § 853. Both defendants seek to suppress evidence obtained by the Nebraska State Patrol (NSP) during a traffic stop on Interstate 80 near North Platte, Nebraska, on October 31, 2005.

An evidentiary hearing was held on the defendants' motions on May 31, 2006. Hernandez appeared with his counsel, Stephen G. Ralls. Miranda appeared with her counsel, Kristina B. Murphree. Assistant U.S. Attorney Kimberly C. Bunjer appeared for the United States. Chandler Thompson, a certified interpreter in the Spanish language, served as the interpreter by remote telephone hook-up. During the hearing, the court heard the testimony of NSP Trooper Dean Riedel (Trooper Riedel). The court also received into evidence an audio videotape recording from an NSP cruiser camera (Exhibit 1); a transcript of portions of the videotape (Exhibit 2); and a photocopy of a New York State Insurance Registration Card, a New York State Registration Document, and the defendants' Oregon driver licenses, (Exhibit 3). A transcript of the hearing (TR.) was filed on June 4, 2006 (Filing No. 50).

## FINDINGS OF FACT

On October 31, 2005, Trooper Riedel was in uniform and on road patrol in his marked NSP cruiser together with his police service dog, Bruno (TR. 13). Trooper Riedel and Bruno were currently certified as a drug detection canine unit for the NSP (TR. 13). Trooper Riedel was parked stationary in the median near mile marker 184 on Interstate 80 near North Platte, Nebraska, when Trooper Riedel observed a white Ford pickup bearing New York license plates which appeared to be traveling in excess of the posted seventy-five mile per hour speed limit (TR. 13-14). As the pickup crested a bridge near Trooper Riedel's location, Trooper Riedel activated his unit's Stalker radar and obtained a reading of 81 miles per hour on the Ford pickup (TR. 14). As the Ford pickup passed Trooper Riedel's location, Trooper Riedel drove off the median and proceeded to catch up with the Ford pickup (TR. 14). After insuring that the Ford pickup was the same one Trooper Riedel clocked with his radar, Trooper Riedel activated his emergency lights, whereupon the Ford pickup pulled to the side of the highway and stopped on the shoulder near mile marker 186 eastbound on Interstate 80 (TR. 14). The time was 11:18 a.m. on October 31, 2005 (TR. 15). As soon as Trooper Riedel turned on his emergency lights, a video camera mounted near his rear view mirror in his NSP vehicle was activated (TR. 14; Exhibit 1). The video camera continued to run during the entire stop (TR. 15). The videotape is annotated with the time of the day, Trooper Riedel's NSP badge number, an "M" for when the microphone is engaged, and a "L" noting the emergency lights were activated (TR. 15).

Trooper Riedel approached the Ford pickup on the passenger side of the pickup and observed a male driver (Hernandez), a female (Miranda) in the front passenger seat, and a little child in the second row of seats (TR. 15). Trooper Riedel told the occupants they had been stopped for speeding and asked Hernandez for a driver's license, a vehicle registration, and an insurance card (TR. 16). Hernandez provided an Oregon driver's license in his name and a New York State vehicle registration and insurance identification card in the name of Jose Meza (TR. 16; Exhibit 3). Trooper Riedel told Hernandez a warning citation would be issued and directed Hernandez to come back to Trooper Riedel's patrol unit and have a seat while Trooper Riedel completed the paperwork (TR. 16). While at the passenger side of the pickup, Trooper Riedel noted a couple of pieces of luggage

2

(described by Trooper Riedel as minimal), a Red Bull sports drink, and a strong odor of perfume coming from the pickup (TR. 17). Trooper Riedel also noticed the hood and right quarter panel of the pickup to be misaligned in height and a severe gap near the windshield between the quarter panel and the hood (TR. 17). Trooper Riedel described these variances as an inch gap between the quarter panel and the hood and an up and down offset of approximately a half inch (TR. 17).

Trooper Riedel met Hernandez at the rear of the pickup, and Trooper Riedel and Hernandez walked to Trooper Riedel's patrol car, Hernandez asked how much the ticket was going to be (TR. 17). Trooper Riedel told Hernandez that only a warning ticket was going to be issued and asked Hernandez to have a seat in Trooper Riedel's patrol car after Trooper Riedel cleared some items off of the front passenger seat (TR. 17). After Hernandez and Trooper Riedel were seated in the patrol car, Trooper Riedel began completing paperwork for the warning citation and running the pickup identification and that of Hernandez through NSP dispatch for wants or warrants (TR. 17-18). During this time Trooper Riedel engaged Hernandez in conversation about Hernandez's itinerary (TR. 18). Hernandez stated he was coming from Denver and heading to Chicago to visit family (TR. 18). Hernandez stated Miranda was his niece (TR. 18). Hernandez stated he used to live in Oregon but was getting a divorce and was traveling to Chicago (TR. 18). Hernandez stated he had traveled to Denver from Chicago (TR. 18). When asked about the pickup, Hernandez stated the pickup belonged to his brother-in-law, Jose Mendoza, but quickly changed the name to Jose Mesa (TR. 18). Hernandez said his brother-in-law had driven the pickup from New York to Denver to visit family but had to leave the pickup in Denver and fly back to New York (TR. 19). Hernandez stated Miranda was his 20-year-old niece and the young girl in the back seat was about four years old (TR. 19). Hernandez told Trooper Riedel that he (Hernandez) had set his cruise control on 76 or 77 miles per hour but was told by Trooper Riedel that Hernandez was clocked at above 80 miles per hour (TR. 20). Trooper Riedel explained the problem could be the oversized tires on the pickup (TR. 20). Trooper Riedel noted that Hernandez appeared to very nervous as compared to a normal person who had been stopped, and Hernandez's responses to questions were very short and hesitant (TR. 20).

Trooper Riedel got out of the patrol car and walked to the front of the pickup to compare the VIN in the windshield with the vehicle registration and insurance cards (TR. 20). While checking the VIN on the dash of the pickup, Trooper Riedel again noticed the gap in the hood and the left quarter panel was even larger than what he noticed on the passenger side when he first approached the pickup (TR. 21). This gap raised Trooper Riedel's suspicion that there could be some irregular compartments in the front of the pickup (TR. 21). While checking the VIN, Trooper Riedel received a radio communication through the microphone on his uniform that there were no wants or warrants, that Hernandez's driver's license was valid, and the pickup was registered to Jose Mesa (TR. 21). Trooper Riedel then talked to Miranda who told Trooper Riedel that she and Hernandez were coming from Tucson, Arizona, and they were traveling to Chicago to visit family (TR. 22). Miranda stated she was not sure when they left Tucson but had stayed the night in Denver on their way to Chicago (TR. 22). Trooper Riedel stated Miranda seemed more nervous than the average person at a routine traffic stop and avoided eye contact with Trooper Riedel when talking with him (TR. 23). Trooper Riedel returned to his patrol car (TR. 24).

Trooper Riedel finished his paperwork and handed the various identification papers back to Hernandez along with the warning ticket and informed Hernandez he was free to go (TR. 24). As Hernandez began to get out of the patrol car, Trooper Riedel asked Hernandez if he (Trooper Riedel) could ask Hernandez some more questions (TR. 24). Hernandez agreed and retook his seat in the patrol car (TR. 24-25). Trooper Riedel asked Hernandez if Hernandez had started his trip any further in the west and Hernandez replied that he had picked up his niece in Phoenix but that he picked up the pickup in Denver from his brother-in-law (Exhibits 1 and 2). Trooper Riedel told Hernandez there was a problem with illegal stuff going up and down the interstate (Exhibits 1 and 2). Trooper Riedel asked Hernandez if there was anything illegal in his pickup and Hernandez replied "No" (Exhibits 1 and 2). Trooper Riedel then asked if Hernandez had any of a litany of contraband items to which Hernandez replied "No" in each instance (Exhibits 1 and 2). Trooper Riedel asked Hernandez if Trooper Riedel could search the vehicle (TR. 26-27; Exhibits 1 and 2). Hernandez hesitated and asked if Trooper Riedel had a search warrant and Trooper Riedel

4

stated he did not (TR. 27; Exhibits 1 and 2). When asked again if Trooper Riedel could search the vehicle, Hernandez hesitated and said "If you want to" (Exhibits 1 and 2). Trooper Riedel then retrieved a Spanish language consent to search form and went over it with Hernandez, yet Hernandez hesitated in giving his okay (Exhibits 1 and 2). When asked again by Hernandez if Trooper Riedel had a search warrant, Trooper Riedel stated he did not need a search warrant as he was asking for Hernandez's consent (Exhibits 1 and 2). Trooper Riedel asked if Hernandez had any luggage in the vehicle, and Hernandez told Trooper Reidel he did and which luggage was his and which was Miranda's (Exhibits 1 and 2). Trooper Riedel then asked if he could talk with Miranda and Hernandez said "uh-hum" (Exhibits 1 and 2). Trooper Riedel got out of the patrol car and walked to the passenger side of the pickup to talk with Miranda (TR. 28-29).

     Trooper Riedel told Miranda about contraband going up and down the interstate and asked if anything illegal was in the vehicle using a similar litany of questions asked of Hernandez (TR. 29; Exhibits 1 and 2). Miranda replied "No" to each of his questions. During this time Trooper Riedel asked Miranda to take off her sunglasses and look at him (Exhibits 1 and 2). Trooper Riedel testified that Miranda broke eye contact with him and looked away when being asked the questions (TR. 29). When Miranda described her luggage in the back seat area, Trooper Riedel asked if he could search her bags and she agreed (TR. 29; Exhibits 1 and 2). Trooper Riedel asked Miranda to take her bags out of the vehicle along with her daughter (TR. 29). Trooper Riedel told Miranda he was going to have Miranda and her daughter have a seat in his patrol car because it was warmer then standing outside (Exhibits 1 and 2). Trooper Riedel told Miranda before he was going to put her in his patrol vehicle, he asked Miranda if she had any weapons in her purse, which was in her hands (Exhibits 1 and 2). Trooper Riedel asked to search Miranda's purse for "weapons or anything like that" (Exhibits 1 and 2). Trooper Riedel testified Miranda said he could search her purse and she displayed her purse with the front flap open but held the back compartments of the purse closed (TR. 30). Trooper Riedel looked into the back compartments and saw bundles of U.S. currency wrapped in hair bands (TR. 30). When asked how much money there was, Miranda replied the money was hers and it totaled about $9,000 (TR. 30). Trooper Riedel had Miranda and her daughter have a seat in his

patrol vehicle after having Hernandez step out of the vehicle, obtaining Hernandez's coat from the pickup, and having Hernandez stand outside the patrol car (TR. 30).

Trooper Riedel then deployed his canine, Bruno (TR. 30).  Trooper Riedel took Bruno around the vehicle and Bruno alerted to the odor of narcotics at the front of Hernandez's vehicle (TR. 31).  Trooper Riedel repeated the process and Bruno again alerted to the front of the vehicle (TR. 31).  Trooper Riedel placed Bruno back in the patrol vehicle and advised Hernandez and Miranda that Bruno had alerted to the presence of narcotics in their vehicle and that gave him probable cause to search their vehicle (TR. 32; Exhibits 1 and 2).  Hernandez was handcuffed at his back and Miranda was handcuffed in the front so she could hold onto her daughter (Exhibits 1 and 2).  The vehicle was searched and a compartment was found in the front of the vehicle.  The vehicle was towed into an NSP facility in North Platte, Nebraska, where a quantity of cocaine was seized.

## LEGAL ANALYSIS

Hernandez asserts the detention of the vehicle and occupants after the issuance of the warning ticket was illegal as was the subsequent search of the vehicle.  Miranda asserts she was illegally detained and the search of her purse was illegal.  Apart from her illegal detention, Miranda concedes she consented to the search of her luggage but not her purse (TR. 92).  Miranda, as a passenger in the vehicle, concedes she has no standing to assert a Fourth Amendment violation of the search of the vehicle and the seizure of the cocaine from the vehicle's front engine compartment (TR. 92).

The government argues Trooper Reidel had a reasonable articulable suspicion of ongoing criminal activity to detain Hernandez, Miranda, and the pickup for further investigation.  Furthermore, Hernandez consented to the additional investigation and detention during which the drug detection canine was deployed.  As to Miranda, the government agues Miranda consented to the search of her purse when she held it open to Trooper Riedel and that Trooper Riedel's looking into the back of Miranda's purse was merely for officer safety when Miranda appeared to be hiding something in her purse before Miranda entered the patrol vehicle. The government further argues, assuming *arguendo*, there was an insufficient basis for a **Terry** investigation or a consent by Hernandez, the

drug detection canine was deployed in such a short time from conclusion of the delivery of the warning ticket, any Fourth Amendment violation was *de minimus* not warranting the application of the exclusionary rule.

"[A] police officer who personally observes a traffic violation has probable cause to stop the vehicle." ***United States v. $404,905.00 in U.S. Currency,*** 182 F.3d 643, 646 (8th Cir. 1999) **citing *Pennsylvania v. Mimms***, 434 U.S. 106, 109 (1977). In this case, Trooper Riedel clocked Hernandez's pickup exceeding the posted speed limit. Contemporaneous with a valid traffic stop, a police officer may detain the motorist while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation. ***$404,905.00,*** 182 F.3d at 647; **see also *United States v. Sokolow***, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about the motorist's destination, purpose of the trip and whether the police officer may search the vehicle. ***$404,905.00,*** 182 F.3d at 647; ***United States v. Allegree,*** 175 F.3d 648, 650 (8th Cir. 1999). The police officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made the police officer regarding illegal drug use, and divergent information from the passengers. ***$404,905.00,*** 182 F.3d at 647; ***Allegree,*** 175 F.3d at 650-51.

Police officers may make a valid investigatory stop of a vehicle based on reasonable suspicion that the occupants of the vehicle are engaged in criminal activity. **See *Terry v. Ohio***, 392 U.S. 1, 25-31 (1968); ***United States v. Sharpe***, 470 U.S. 675, 682 (1985); ***United States v. Navarrete-Barron***, 192 F.3d 786, 790 (8th Cir. 1999). The reasonable suspicion necessary to justify an investigatory stop must include "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." ***Terry***, 392 U.S. at 21; **see *Navarrete-Barron***, 192 F.3d at 790. The courts must give law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances." ***United States v. Washington***, 109 F.3d 459, 465 (8th Cir. 1997). "After making a valid ***Terry*** stop, police officers must diligently work to confirm or dispel their suspicions in a short period of time." ***United States v. Bell***, 183 F.3d 746, 749 (8th Cir. 1999). However, once the officer has informed the traffic offender

he may leave with a warning ticket, the Fourth Amendment applies to limit a subsequent detention or search. **United States v. Alexander**, 448 F.3d 1014, 1016 (8th Cir. 2006); **$404,905.00**, 182 F.3d at 648. The government argues Trooper Riedel had a reasonable articulable suspicion of ongoing criminal activity, and the parameters of **Terry** apply to the detention of Hernandez and the vehicle until the canine alert. Furthermore, Hernandez consented to answer Trooper Riedel's questions and, in effect, consented to any reasonable detention.

The canine was deployed after there was confusion as to whether Hernandez would consent to the search of the pickup. Trooper Riedel concluded Hernandez did not consent even though Hernandez at one point uttered an "uh-huh" as to whether Trooper Riedel could look in the pickup. When Hernandez declined to sign the consent form and asked about a search warrant, Trooper Riedel concluded Hernandez did not consent to the search of the pickup. Trooper Riedel then approached Miranda regarding the search of her belongings. Miranda consented and removed them from the pickup. Before Miranda and her child had a seat in Trooper Riedel's patrol car, he asked to look into Miranda's purse, which she had in her hand, for weapons. Miranda opened the purse for him to look into and eventually saw the bundle of money in the purse. The money was not seized until after Hernandez and Miranda were arrested following the finding of the drugs in the pickup.

Thereafter, Trooper Riedel performed a canine sniff of the exterior of Hernandez's vehicle. The canine sniff of the vehicle did not constitute a "search" within the meaning of the Fourth Amendment.

> [A] canine sniff of the exterior of personal property in a public location "is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure" that it does not constitute a "search" within the meaning of the Fourth Amendment. **United States v. Place**, 462 U.S. 696, 707, 103 S. Ct. 2637, 77 L. Ed.2d 110 (1983) (luggage at an airport). That principle applies to the canine sniff of the exterior of [a] trailer stopped along an interstate highway. In general, "[t]he exterior of a car . . . is thrust into the public eye, and thus to examine it does not constitute a 'search.'" **New York v. Class**, 475 U.S. 106, 114, 106 S. Ct. 960, 89 L. Ed.2d 81 (1986).

***$404,905.00,*** 182 F.3d at 647.  Furthermore, a police service dog's alert to the odor of drugs in a vehicle provides probable cause that drugs are present.  ***Place***, 462 U.S. at 706; **United States v. Bloomfield,** 40 F.3d 910, 919 (8th Cir. 1994), **cert. denied,** 514 U.S. 1113 (1995).  After probable cause is established, a car can be searched without a warrant under the automobile exception to the warrant requirement.  ***Chambers v. Maroney***, 399 U.S. 42, 52 (1969).  The canine alerted, and such alert provided probable cause for the vehicle to be thoroughly searched resulting in the seizure of the cocaine, the arrests of Hernandez and Miranda, and the seizure of the currency.

Hernandez and Miranda assert they were unreasonably detained following Hernandez's refusal to provide consent to search the vehicle and the canine sniff thereby rendering the canine sniff illegal.  "A canine sniff of the exterior of a car conducted during a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner does not infringe upon a constitutionally protected interest in privacy."  ***United States v. Martin***, 411 F.3d 998, 1002 (8th Cir. 2005).  As the Eighth Circuit held in ***Alexander***,

> Even if the lawfully initiated traffic stop terminated at the point at which Trooper Drown told Alexander that he would receive only a warning, our decisions in ***$404,905.00*** and ***Martin*** compel the conclusion that the subsequently conducted dog sniff was a *de minimus* intrusion on Alexander's Fourth Amendment rights.

***Alexander***, 448 F.3d at 1016.

The detention of the vehicle after Hernandez declined to sign the consent to search form was brief before Trooper Riedel deployed his canine to sniff the vehicle.  Whether considered as a detention under ***Terry*** or as a *de minimus* intrusion following the lawful traffic stop, the court finds Trooper Riedel's actions to be executed in a reasonable and timely manner.  The court finds no Fourth Amendment violation occurred during Trooper Riedel's stop and Hernandez's and Miranda's motions to suppress should be denied.

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

1. Hernandez's motion to suppress (Filing No. 27) be denied; and
2. Miranda's motion to suppress (Filing No. 35) be denied.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 10th day of July, 2006.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge